UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HARPAK-ULMA PACKAGING, LLC, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 21-10511-JCB |
| DIGI EUROPE LIMITED, | ) |
| Defendant. | ) |

ORDER DEFENDANT'S MOTION TO DISMISS[1]
[Docket No. 9]

October 4, 2021

Boal, M.J.

Defendant Digi Europe Limited ("Digi") has moved to dismiss this case on grounds of forum non conveniens. Docket No. 9. I heard oral argument on September 22, 2021. For the following reasons, I deny the motion.

I.   FACTUAL BACKGROUND[2]

A.   The Parties

Plaintiff Harpak-Ulma Packaging, LLC ("HUP") is a Delaware limited liability company with a principal place of business in Taunton, Massachusetts. Complaint at ¶ 1. HUP develops, markets, distributes, and sells automated packaging solutions to food, medical, pharmaceutical,

---

[1] On July 6, 2021, the parties consented to the jurisdiction of a U.S. magistrate judge for all purposes. Docket No. 14.

[2] For purposes of resolving this motion, I take all well-pleaded allegations in the complaint bearing on the venue question as true, unless contradicted by the defendant's affidavits. See Snöfrost AB v. Håkansson, 353 F. Supp. 3d 99, 102, n. 1 (D. Mass. 2018) (citations omitted).

1

and consumer products manufacturers. Id. at ¶ 3.

Digi is an England-based supplier of a wide range of commercial products (including scales, registers, printers, vending, and commercial equipment) for businesses operating in the retail, food, hospitality, and logistics industries. Affidavit of Oliver Richardson in Support of Defendant's Motion to Dismiss the Complaint on <u>Forum</u> <u>Non</u> <u>Conveniens</u> Ground [sic] (Docket No. 11) ("Richardson Aff.") at ¶¶ 2, 3.

B.    The Parties' Agreement

On or about October 18, 2013, HUP and Digi entered into an Exclusive Agreement (the "Agreement"), pursuant to which HUP was appointed as Digi's exclusive distributor for certain Digi products in North America, including Canada. Complaint at ¶ 5; see also Richardson Aff. at ¶ 4; Affidavit of Linda Harlfinger in Support of Plaintiff's Opposition to Defendant's Motion to Dismiss the Complaint on Forum Non Conveniens Grounds (Docket No. 18-2) ("Harlfinger Aff.") at ¶ 3.

Section 3 of the Agreement provided for "an initial term of three years and thereafter shall continue without limit in time unless terminated by either party by written notice to the other of not less than 180 days." Docket No. 11 at 9; see also Complaint at ¶ 9. In the event of termination of the Agreement by Digi, Digi was to pay "a termination fee equal to an amount that is equal to [HUP's] gross profit margin (as defined by GAAP) on the sale of the Products made by [HUP] to [HUP's] customers for the 24 month period immediately prior receipt of a termination notice." Docket No. 11 at 18. However, Digi was not obliged to pay this termination fee if "in the year of this Agreement . . . most recently ended before [Digi's] delivery of notice of termination under Section 3, [HUP] failed to purchase a dollar amount of Products equal or greater to the Minimum Amount for that contract year." Id. Section 10 of the

Agreement defines the "Minimum Amount" as an amount that either is agreed upon by the parties or is otherwise calculated based upon a 5% increase from the prior year's purchase levels. See Docket No. 11 at 14.

The Agreement provides that it "shall be governed by the laws of England and the parties agree to submit to the non-exclusive jurisdiction of the Courts in England."  Docket No. 11 at 23.

    C.    <u>The Parties' Dealings Under The Agreement</u>

Digi and HUP conducted business in accordance with the Agreement between October 2013 until approximately October 2020.  Richardson Aff. at ¶ 9; Harlfinger Aff. at ¶ 8.  During this period, HUP sent purchase orders from its principal office in Taunton, Massachusetts to Digi.  Harlfinger Aff. at ¶ 8.  Decisions over which items to purchase and the quantity of items to purchase were made from HUP's principal office.  <u>Id.</u>  The purchase orders and related emails and correspondence were initiated in Massachusetts.  <u>Id.</u>

Under the Agreement, HUP could place orders for either "standard production products" or "non-standard production products."  Docket No. 11 at 10.  Standard production products are "off the shelf" and maintained as part of HUP's normal inventory as a distributor.  Harlfinger Aff. at ¶ 14.  Non-standard production products are special order items.  <u>Id.</u>  Pursuant to the Agreement, orders for standard production products were to be automatically accepted by Digi.  Docket No. 11 at 10; Harlfinger Aff. at ¶15.  With respect to non-standard production products, the parties were to "reach agreement as to specification, price and lead times, in writing, prior to Distributor placing the applicable purchase order."  Docket No. 11 at 10.

According to Digi, the interactions between Digi and HUP relating to purchases under the

Agreement generally adhered to the following procedures:[3] Once HUP determined to purchase a certain product from Digi, HUP would send a signed purchase order for the product to Digi's sales team and administrative team, both of which were based exclusively in England. Richardson Aff. at ¶ 9(a). In addition to the purchase order, HUP would also typically send to Digi a sheet that contained the various technical specifications for the order. Id. On many occasions, Digi's sales personnel would be required either to complete the specification sheet or to provide additional information to supplement the specification sheet in a manner necessary to allow the Digi administrative team to evaluate properly the purchase order. Id.

Upon receipt of the purchase order and specification sheet, the Digi sales team in England, which included its now former Head of Sales Colin Smith and its Account Manager Glenn Fruish, would review and approve the documents provided by HUP and then pass those documents on to Digi's administrative team, which included Digi's Team Leader Jennifer Coleman and another former employee, Georgina Hammon. Id. at ¶ 9(b). The Digi administrative team would then communicate with Digi's procurement team lead by Connor Keown and with Digi's production team lead by another Digi employee, Nicholas Brierley, in order to ensure that Digi had the capacity to complete the proposed order. Id. All personnel working for Digi's procurement team and the production team were based in Suffolk, England. Id.

Digi's administrative team would review the documentation relating to the purchase order in order to ensure that the pricing, specifications, and proposed completion date set forth in the purchase order and its accompanying documents were acceptable to Digi. Id. at ¶ 9(c). At

---

[3] HUP maintains that this process applies only to non-standard production products. Harlfinger Aff. at ¶ 13.

the conclusion of this administrative review, Digi would either (1) accept the purchase order, or (2) reject the purchase order and return it to HUP with proposed amendments or other proposed changes or questions. Id. If the purchase order was rejected and returned to HUP after the administrative review, the ordering process would then commence again (if at all) from the beginning, with HUP issuing a new purchase order to Digi. Id. at ¶ 9(d).

If the purchase order was approved by Digi after its administrative review, Digi's England-based administrative team would then issue an order confirmation to the sales teams for both Digi and HUP, agreeing to the proposed price, specifications and the proposed shipping timeline for the product. Id. at ¶ 9(e). Upon receipt of the order confirmation, HUP was then generally required to make a 50% deposit to Digi Europe in order to proceed with the purchase of the product. Id. at ¶ 9(f). For certain smaller orders, HUP was required to make full payment for the product to Digi within 30 days. Id.

Once the manufacturing of the requested product was completed by Digi at its Suffolk-based production facilities, Digi Europe's administrative team would contact HUP to confirm shipping details. Id. at ¶ 9(g). At this point, an invoice reflecting the balance owed would be issued by Digi to HUP. Id. Consistent with the terms of the Agreement and other documents provided to HUP, the product would be considered to be purchased and delivered to HUP when it was picked up from Digi's factory in Suffolk, England. Id. at ¶ 9(h).

D. The Parties' Dispute

On April 14, 2020, Digi provided notice of termination under Section 3 of the Agreement. Complaint at ¶ 18. HUP alleges that, pursuant to the Agreement, Digi was required to pay a termination fee of $607,257. See Complaint at ¶¶ 19, 21. Digi, however, maintains that HUP failed to purchase the Minimum Amount of product necessary to trigger the termination

fee. Id. at ¶ 20. According to HUP, the dispute regarding whether HUP had met the Minimum Amount involves the inclusion of Purchase Orders 9013 and 9014, dated October 4 and October 7, 2019, respectively in the contract year ending October 18, 2019. Harlfinger Aff. at ¶ 11. HUP maintains that both of these purchase orders were for standard production products. Id. Digi, on the other hand, maintains that the October purchase orders involved special requests and products that were not "off the shelf," and, therefore, qualified as non-standard production products. Supplemental Affidavit of Oliver Richardson in Support of Defendant's Motion to Dismiss the Complaint on Forum Non Conveniens Grounds (Docket No. 22-1) ("Richardson Supp. Aff.") at ¶¶ 4-5.

On March 25, 2021, HUP filed this action, alleging that Digi's failure to pay the termination fee is a breach of the Agreement. Complaint at ¶¶ 23-31. HUP has also brought a claim for unjust enrichment. Id. at ¶¶ 32-39.

II. ANALYSIS

"The doctrine of forum non conveniens . . . permits a court to dismiss a case because the chosen forum (despite the presence of jurisdiction and venue) is so inconvenient that it would be unfair to conduct the litigation in that place." Nandjou v. Marriott Int'l, Inc., 985 F.3d 135, 140 (1st Cir. 2021) (quoting Howe v. Goldcorp Invs., Ltd., 946 F.2d 944, 947 (1st Cir. 1991)). "'[T]he practical effect' of a dismissal on these grounds is to require the plaintiff 'to file his complaint in a more convenient forum elsewhere' in order to obtain relief." Id.

A defendant moving for dismissal on forum non conveniens grounds "bears the burden of showing both that an adequate alternative forum exists and that considerations of convenience and judicial efficiency strongly favor litigating the claim in the alternative forum." Imamura v. General Elec. Co., 957 F.3d 98, 106 (1st Cir. 2020) (quoting Iragorri v. Int'l Elevator, Inc., 203

F.3d 8, 12 (1st Cir. 2000)).  At the first step, an adequate alternative forum exists when "(1) all parties can come within that forum's jurisdiction, and (2) the parties will not be deprived of all remedies or treated unfairly, even though they may not enjoy the same benefits as they might receive in an American court."  Id. (quoting Mercier v. Sheraton Int'l, Inc., 935 F.2d 419, 424 (1st Cir. 1991)).

At the second step, the district court performs a balancing test to determine whether the defendant has demonstrated that "the compendium of factors relevant to the private and public interests implicated by the case strongly favors dismissal."  Id. at 107 (quoting Iragorri, 203 F.3d at 12).  Relevant private interest factors include:

> the relative ease of access to sources of proof; availability [and cost] of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious[,] and inexpensive.

Id. (quoting Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947)).  In evaluating private factors, the court "must pay close attention to, among other things, the nature of the plaintiff's claims and the evidence that would be relied upon to adjudicate them, while giving particular attention to where the witnesses are located and how burdensome it would be for them to appear in either the home or the foreign forum."  Nandjou, 985 F.3d at 142 (citations omitted).

Relevant public factors include:

> the administrative difficulties flowing from court congestion; the 'local interest in having localized controversies decided at home'; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.

Imamura, 957 F.3d at 107 (quoting Piper Aircraft Co. v. Reyno, 454 U.S. 235, 241, n. 6 (1981)).  "These factors constitute a 'helpful starting point' but because the facts of each case are unique,

7

'the ultimate inquiry is where trial will best serve the convenience of the parties and the ends of justice.'" Id. (internal citations omitted).

Here, HUP has assumed, for purposes of this motion, that Digi can show that England is an adequate alternative forum. See Docket No. 18 at 4. Accordingly, I proceed to the second step of the inquiry.

     A.     <u>Location Of Witnesses And Evidence</u>

Digi argues that because "[n]early all witnesses to the purchases that are relevant to this dispute are located in England" and "nearly every document material to this dispute is also located in England," its private interest weighs heavily in favor of litigating this case in England. Docket No. 10 at 10-11. However, HUP has also identified several witnesses located in Massachusetts or otherwise in the United States. See Harlfinger Aff. at ¶ 9. Moreover, given the nature of the parties' dispute, the evidence in the case is likely to be largely of a documentary nature. It appears just as likely that key documents will be located at HUP's offices in Taunton, Massachusetts. Digi has not sufficiently shown that all of the key documents are located in England. In any event, Digi's concerns appear to be overstated as modern technology and digitization have made transnational evidence collection far less burdensome. See, e.g., Otto Candies, LLC v. Citigroup, Inc., 963 F.3d 1331, 1349 (11th Cir. 2020).

     B.     <u>Availability Of Compulsory Process For Unwilling Witnesses</u>

Digi also argues that three of its witnesses are no longer employed by Digi and therefore cannot be compelled to appear at any proceeding in this district. Docket No. 10 at 10. However, Digi has not explained why live testimony from these particular three witnesses is critical to its case. See, e.g., Nandjou, 985 F.3d at 147.

C.       Applicable Law

The Agreement provides that it shall be governed by the laws of England. Docket No. 11 at 23. While this factor is non-dispositive because "the task of deciding foreign law [is] a chore federal courts must often perform," Mercier v. Sheraton Int'l, Inc., 981 F.2d 1345, 1357 (1st Cir. 1992), it does weigh in favor of dismissal.

D.       Location Of Events Underlying The Action

A critical issue in this case appears to be whether or not HUP failed to purchase the Minimum Amount under the Agreement. See Docket No. 10 at 5. HUP alleges that the sales in dispute were for standard production products and, therefore, once the disputed purchase orders were sent to Digi from Massachusetts, Digi was required to accept the purchase. Digi, on the other hand, argues that the disputed purchase orders involved non-standard production products. Docket No. 22 at 5-7. Therefore, Digi's internal administrative process, which occurred in England, applies to the disputed transactions. See id.; Docket No. 10 at 10-11. Digi continues that, therefore, the "center of gravity" for this dispute lies in England, not the United States. Docket No. 10 at 11.

At this stage, this Court is unable to resolve the issue of whether the disputed transactions involve standard or non-standard production products. In any event, I note that the Agreement involves the exclusive distribution of Digi's products in the United States, as well as in Canada. In addition, the performance of the contract, in terms of payment, occurred in Massachusetts. See, e.g., Zane S. Blanchard & Co. v. PSPT Ltd., No. 92-660-SD, 1995 U.S. Dist. LEXIS 7289, at *14 (D.N.H. May 18, 1995) (finding that local forum had significant interest in contract dispute where payment was sent from company headquarters). Therefore, at most, this factor is a wash.

E.   The Administrative Difficulties Arising From Court
     Congestion In The Plaintiff's Chosen Forum

Digi contends that the courts of England offer a "far more efficient and far less congested alternative forum for the prompt resolution of this dispute than the District of Massachusetts." Docket No. 10 at 10. In support of its argument, Digi cites to a 1997 case stating that the dockets of this district are "heavy with both civil and criminal cases." Id. at 8 (citing Smith v. Chason, No. 96-10788-PBS, 1997 WL 298254, at *11 (D. Mass. Apr. 10, 1997)). However, the current data for the District of Massachusetts shows a caseload that is trending downward and that has been reduced by over forty-two percent since 2016. See Docket No. 18-1 at 45-48.

Digi also states that this case would most likely be filed in the London Circuit Commercial Court (the "LCCC") and that parties filing in the LCCC "faced a wait of less than one month for a hearing on those applications (with a two month wait for a full day hearing) and as little as two months for a trial date of any length." Affidavit of Robert Adam, Esq., in Support of Defendant's Motion to Dismiss the Complaint on Forum Non Conveniens Ground [sic] (Docket No. 12) ("Adam Aff.") at ¶¶ 4, 7. Digi further submits that "as of June 15, 2021, parties seeking hearings of an hour or less could be heard within three weeks of the application being filed, while parties applying for trial dates at that point (with a trial time estimate of a week or less) could be heard as soon as November 2021." Id. at ¶ 7.

The materials submitted by Digi, however, show that hearings were available within a month only if they lasted less than half a day. See Docket No. 12 at 13. Digi has not explained the type or length of a hearing that would be necessary in this case. It also has failed to explain whether such a hearing would dispose of the case. Moreover, more recent data shows February 7, 2022 as the earliest date for a trial with a time estimate of a week or less. See Docket No. 18-3 at 6. In any event, Digi has not accounted for potential delays due to the COVID-19 pandemic

10

that are as likely to occur in England as they are here.  Accordingly, Digi has not met its burden to show that resolution of this case would be more efficient in England than in the District of Massachusetts.

Dismissal based on forum non conveniens grounds is not appropriate when consideration of the private and public factors show that the relative burdens of litigating in the plaintiff's chosen forum are equal or only marginally favor litigating in the alternative forum.  Nandjou, 985 F.3d at 141.  Rather, Digi bears a "heavy burden" and "must show that the assessment of the relevant public and private interests favors the case being litigated in the foreign forum to such a degree that it suffices to overcome the presumption that the plaintiff is entitled to bring [its] case in [its] home forum."  Id. (citations omitted).  Here, as the foregoing discussion demonstrates, Digi has shown, at most, that the relative burdens of litigating in Massachusetts are about equal to the burdens of litigating in England.  Accordingly, Digi has failed to meet its burden to show that dismissal on forum non conveniens grounds is appropriate.

III.   ORDER

For the foregoing reasons, I deny Digi's motion to dismiss on forum non conveniens grounds.

                                      /s/ Jennifer C. Boal
                                      JENNIFER C. BOAL
                                      U.S. MAGISTRATE JUDGE